RESOURCES LIMITED, INC., a non-profit corporation; Swan View Coalition, Inc., a non-profit corporation; Friends of the Wild Swan, a non-profit corporation; Five Valleys Audubon Society, a non-profit organization; and Sierra Club, a non-profit corporation, Plaintiffs,

v.

F. Dale ROBERTSON, in his capacity as Chief of the United States Forest Service, Department of Agriculture; John Mumma, in his official capacity as Regional Forester, Region One, of the United States Forest Service; and Edgar B. Brannon, Jr., in his official capacity as Forest Supervisor, Flathead National Forest, Defendants,

and

Intermountain Forest Industry Association, Defendant–Intervenor.

No. CV 89–41–H–CCL.

United States District Court, D. Montana, Helena Division.

Nov. 6, 1991.

Jon Heberling, McGarvey, Heberling, Sullivan & McGarvey, Kalispell, Mont., Douglas Honnold, Fern L. Shepard, Rolf G. Asphaug, Andrew Caputo, Sierra Club Legal Defense Fund, Denver, Colo., Daniel J. Rohlf, Portland, Or., and James Goetz, Bozeman, Mont., for plaintiffs.

Peter Van Tuyn, Gary B. Randall, Wells D. Burgess, Gregory D. Page, U.S. Dept. of Justice, Washington, D.C., Bob Brooks, Asst. U.S. Atty., Butte, Mont., John D. Mudd, Missoula, Mont., and Steven P. Quarles, Crowell & Morning, Washington, D.C., for defendants.

## OPINION AND ORDER

LOVELL, District Judge.

This matter came on for hearing on May 29, 1991, on cross motions for summary judgment. Plaintiffs Resources Limited, Swan View Coalition, Friends of the Wild Swan, Five Valleys Audubon Society, and the Sierra Club filed suit challenging the Flathead National Forest Land and Resource Management Plan (Forest Plan) and its accompanying Environmental Impact Statement (EIS) issued by the United States Forest Service. Plaintiffs attack the adequacy of the 1985 Forest Plan and the two-volume Environmental Impact Statement prepared on the plan. Plaintiffs originally filed a twelve count complaint, alleging various violations of the National Environmental Policy Act (NEPA), the National Forest Management Act (NFMA), and the Endangered Species Act (ESA). Subsequently, counts five and six of the complaint were dismissed without prejudice pursuant to the stipulation of the parties. Therefore, currently before the court are counts one through four and counts seven through twelve.

In count one of its first amended complaint, Plaintiffs state that the Forest Service is charged with the responsibility of ensuring that its actions are not likely to jeopardize species listed under the Endangered Species Act as provided by 16 U.S.C. § 1536(a)(2). Plaintiffs allege that the Forest Service, in discharging its obligation under the Endangered Species Act, failed to use the best scientific and commercial data available pursuant to 16 U.S.C. § 1536(a)(2). Plaintiffs also claim under count one that the Forest Service failed to ensure that its decision to approve and implement the Flathead Forest Plan was not likely to jeopardize listed species in that the Forest Service failed to obtain and consider a comprehensive biological opinion detailing how the decision to implement the plan would affect threatened and endangered species.

In counts two, three, and four, Plaintiffs allege various violations affecting water quality and fisheries. Count two charges that since the Flathead Forest Plan, which provides for a ten-year timber sale program, is a major federal action significantly affecting the quality of the human environment, an adequate EIS disclosing the impacts of the Forest Plan and the ten-year timber sale program is required. Plaintiffs allege that the Forest Plan EIS does not adequately disclose the sedimentation impacts of the Forest Plan and the ten-year timber sale program on water quality and the fishery resources of the Flathead National Forest streams in violation of the National Environmental Policy Act and its implementing regulations. Count three alleges that the Forest Service does not adequately disclose in its Forest Plan EIS the sedimentation impacts of the Forest Plan and the ten-year timber sale program on water quality and fishery resources in violation of 36 C.F.R. § 219.23. Count four alleges that the Forest Service has not analyzed in detail the mitigation measures adopted by it to protect and improve water quality in the fishery resources or explain

how the mitigation measures will be effective.

Counts seven through eleven each relate in some manner to the selection of alternatives under the plan and particularly focus on the timber management proposed under the plan. Count seven alleges that the Flathead Forest Plan fails to demonstrate that clearcutting is the optimum timber harvest method for any of the proposed timber sales on the Flathead National Forest, while count eight charges that the Forest Service failed to describe the timber sale program in appropriate written materials, including maps and other descriptive materials in violation NFMA. Count nine alleges that the Forest Service failed to include an alternative in the plan EIS, featuring selection management as a method of timber harvest in approximately more than one-fifth of the proposed timber sales under the plan. Count ten claims that the Forest Service placed unreasonable constraints on the FORPLAN computer program which the Forest Service used to determine various output levels for resource uses on the Flathead Forest. Specifically, Plaintiffs claim that the Forest Service, as a result of "unreasonable constraints," failed to reflect the full range of commodity and environmental resource uses and values that could be produced from the forest and, as well, failed to present cost-efficient alternatives, and failed to provide a true comparison between alternatives. Count eleven also attacks the use of the FORPLAN computer program by claiming that the Forest Service made unreasonable assumptions regarding the data used in the program. Plaintiffs claim that the Forest Service assumed unrealistically high timber yields and price trends while assuming that timber harvest costs would not increase in future years. Finally, count twelve alleges that the Forest Service's EIS prepared on the Forest Plan contains insufficient information on an analysis of impacts of the Forest Plan and ten-year timber sale program on grizzly bear and gray wolf habitat in violation of NEPA and its implementing regulations.

Plaintiffs request the following relief from the court:

(1) that the court declare the Forest Service actions are unlawful and in violation of the ESA, NEPA, and NFMA; (2) that the court set aside the Forest Plan and EIS and require the Forest Service to prepare a revised Forest Plan and EIS in compliance with the ESA, NEPA, and NFMA; (3) that the court set aside the Forest Service's determination that the Forest Plan is not likely to jeopardize the continued existence of listed species within the Flathead National Forest Service and require the Forest Service to reinitiate formal consultation with the Fish and Wildlife Service to determine whether the plan is likely to jeopardize the continued existence of threatened and/or endangered species; (4) that the court declare unlawful any further road construction, road reconstruction, or even-aged timber management practices within the Flathead National Forest in grizzly bear habitat, gray wolf habitat, as well as above spawning and rearing habitat for bull trout and west slope cutthroat trout until such time as the Forest Service has fully complied with the ESA, NEPA, and NFMA and their implementing regulations; and (5) that the court preliminarily and permanently enjoin the Forest Service from any further road construction, road reconstruction, and even-age timber management practices within grizzly bear habitat, gray wolf habitat, as well as above any spawning and rearing habitat for the bull trout and west slope cutthroat trout until such time as the Forest Service has complied with the ESA, NEPA, and NFMA.

After reviewing the arguments of the parties and the briefs filed in response to these motions, the court is prepared to rule.

## BACKGROUND

Throughout the 1980s, the United States Forest Service conducted forest planning pursuant to the National Forest Management Act for the 2.3 million acre Flathead National Forest. A draft EIS addressing the effects of potential alternative forest plans and a draft plan were released for public comment in 1983. The Forest Service considered the public comments and

thereafter issued a final EIS which addressed the effects of seventeen alternative forest plans. A final plan was issued in December of 1985. In January of 1986, the Regional Forester selected alternative # 17 as the Flathead Forest Plan. He found this alternative "maximizes net public benefit" by providing a balance among conflicting multiple use objectives. Among the objectives of the plan are offering enough timber to support "Flathead County's largest basic industry"; recommending over 98,000 acres of roadless areas for classification as wilderness by Congress; providing management prescriptions to protect and enhance habitat for grizzly bear, gray wolf, bull and cutthroat trout, and other species; and maintaining a wide range of recreational opportunities.[1]

Various environmental groups, who are now plaintiffs in this suit, filed three administrative appeals with the Chief of the Forest Service. All appeals were decided by the fall of 1988, and the environmental plaintiffs, dissatisfied with the decision by the Chief, filed suit in this court February 23, 1989. A first amended complaint was filed on October 6, 1989. Defendant–Intervenor Inland Forest Industries Association, which represents major purchasers of timber in the Flathead Valley and which had been an intervenor in the administrative appeals process, was permitted to intervene by this court on March 5, 1990.

STANDING

■ Defendant Forest Service, as well as Defendant–Intervenor IFIA, argue that all of the Plaintiffs lack standing under Article III of the United States Constitution, as well as under the Administrative Procedure Act, 5 U.S.C. § 702.

It is well settled that a party must "show that the challenged action has caused him injury in fact and that the injury is to an interest arguably within the zone of interest to be protected or regulated by the statutes that the agencies were claimed to have violated." *Wilderness Soc. v. Griles*, 824 F.2d 4, 11 (D.C.App.1987) (quoting *Sierra Club v. Morton*, 405 U.S. 727, 733, 92 S.Ct. 1361, 1365, 31 L.Ed.2d 636 (1972)). Plaintiffs filed various affidavits from members of their associations and organizations which state that the particular member visits and uses the Flathead National Forest on a regular basis, and that their use and enjoyment of the forest will be inhibited and affected by the adoption of the Flathead Forest Plan. For instance, Steve Kelly submits an affidavit as president of the Friends of the Wild Swan. Mr. Kelly identifies potential actions contemplated by the Forest Plan which could, in his opinion, be detrimental to threatened and/or endangered species.[2]

It appears to the court that this case is not dissimilar to the case of *Idaho Conservation League v. Mumma*, No. CV 88–197–M–CCL, wherein this court determined plaintiffs had no standing because they were challenging a Forest Plan that merely allowed for the possibility of development in the future. There, the court decided that "any future development which might take place will again be determined by the Forest Service and will be subject to the requirements of NEPA. The Forest Service will again be required to prepare an EIS which is specific to the proposed development. The threatened injury in this case is too remote and cannot be directly tied to

**1.** It is worthwhile to note that of the 2.3 million acres of National Forest Systems land managed by the Flathead National Forest, nearly half has been designated wilderness which classification prohibits resource uses such as timber harvesting. According to Defendant Intervenors IFIA, 48% of the jobs in the area result from the timber industry. Historically, the Flathead has provided 100 million board feet of timber per year from its lands. However, in the last five years, the Flathead has averaged only 59.3 million board feet.

It appears to the court that with the myriad of goals which the Forest Service is compelled to

achieve, together with a shrinking land base on which to achieve those goals, the agency has been placed in the nearly impossible situation of serving many masters.

**2.** At the time the court heard oral argument, Plaintiffs filed additional affidavits and other materials in support of their motion. Defendants strenuously objected to the late filing of these materials and request they not be considered by the court. Notwithstanding Defendant's objections, the court has considered the materials to the extent they are relevant.

the plan adopted by the Forest Service. For these reasons the court finds that Plaintiffs lack standing to bring this case." *Idaho Conservation League v. Mumma*, No. CV 88–197–M–CCL, slip op. at 6, 1990 WL 300860 (D.Mont. decided August 7, 1990).

The court finds that in the case presently before it, plaintiffs are also challenging future possible actions which, if the Forest Service takes the next step of implementing specific actions at specific locations, the agency will be compelled to perform NEPA analysis for the specific on-the-ground action. Accordingly, this court finds it is bound by its prior decision in *Idaho Conservation League*, which is now on appeal before the Ninth Circuit Court of Appeals.

## RIPENESS

■ Defendants also argue that the ripeness doctrine precludes current review of the plan and the attendant EIS. For an issue to be ripe for review, there must be "an actual or immediately threatened effect." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). As Defendant intervenor IFIA points out, in *Lujan*, the Supreme Court stated that broad programs are ripe for review only in the rare instance for which a statute directs immediate judicial review. The Court stated in *Lujan:*

> Some statutes permit broad regulations to serve as the "agency action," and thus to be the object of judicial review directly, even before the concrete effects normally required for APA review are felt. Absent such a provision, however, a regulation is not ordinarily considered the type of agency action "ripe" for judicial review under the APA until ... some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him.

*Lujan*, 110 S.Ct. at 3190.

The court finds in this case that judicial review is not available until a concrete action implementing the plan is about to be taken, and therefore Plaintiffs' claims are not ripe.

## MERITS OF THE CASE

Even assuming Plaintiffs are able to show that they have standing and that the issues in controversy are ripe for review, the court finds Plaintiffs would not be successful on any of the claims raised by them in their first amended complaint.

■ Pursuant to the Administrative Procedures Act, 5 U.S.C. § 706(2)(A), the applicable standard of review of an agency decision is whether the decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." See also *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). Where agency action is challenged on the record as arbitrary, capricious, and in violation of the procedures required by law, summary disposition is appropriate. *Northern Spotted Owl v. Hodel*, 716 F.Supp. 479 (W.D.Wash. 1988).

■ Summary judgment is also appropriate in cases involving the issue of whether an EIS adequately explains environmental consequences of a proposed agency action. *Methow Valley Citizens Council v. Regional Forester*, 833 F.2d 810, 815 (9th Cir.1987) (citations omitted).

## COUNT ONE

■ Based on the record before the court, I am unwilling to substitute my judgment for that of the Forest Service in its determination that the Flathead Forest Plan is not likely to jeopardize the continued existence of endangered species. In addition, the court finds the Forest Service did use the best scientific and commercial data available under 16 U.S.C. § 1536(a)(2).

Pursuant to Section 7 of the Endangered Species Act, the Forest Service requested the United States Fish and Wildlife Service to prepare a biological opinion on the proposed Flathead National Forest Plan. The Fish and Wildlife Service initiated consultation in March of 1983, but suspended that consultation on May 17, 1983, at the request of the Regional Forester, so that direction provided in the Northern Region Grizzly Bear Action Plan could be incorpo-

rated into the Forest Plan. In its biological opinion of May 15, 1985, the Fish and Wildlife Service states that it has examined the proposed plan in accordance with Section 7 of the Interagency Cooperative Regulations and the Endangered Species Act and found that implementation of the proposed plan is not likely to jeopardize the continued existence of the grizzly bear, gray wolf, bald eagle, or peregrine falcon.

After reviewing the Fish and Wildlife Service's initial opinion dated May 15, 1985, and subsequent opinions dated February 22, 1989, and July 18, 1989, the court finds that the Forest Service did not arbitrarily rely upon a no jeopardy opinion by the U.S. Fish and Wildlife Service.[3] In fact, the court is impressed by the considerations and protections which the Forest Service adopted when it included in its entirety the Interagency Grizzly Bear Guidelines. For instance, timber sale activities will occur at a time when the area has the least biological importance to the bear. Interagency Grizzly Bear Guidelines at 31. When harvest units are located adjacent to natural or manmade openings, hiding cover will be maintained on approximately 75 percent of the opening's perimeter. *Id.* Clearcutting stands should not occur until adjacent harvested units qualify as summer hiding cover. Sales should be planned so that repeated entries over short periods are avoided. *Id.* And the agency is to maintain a minimum of 40 percent cover of each project area with 20 percent in summer hiding cover and 20 percent in summer

thermal cover distributed throughout the area. *Id.*

The Fish and Wildlife Service issued its amended biological opinion, at least in part, because of these kinds of protections and considerations provided for by the Forest Plan.

Where agency expertise is required, the court is reluctant to interfere with that expertise. Here the government's biological expert has issued a no jeopardy biological opinion, and the Forest Service has relied upon that opinion or opinions. "Another agency's reliance on that [biological] opinion will satisfy its obligation under the act if a challenging party can point to no 'new' information—i.e., information the service did not take into account—which challenges the opinion's conclusion." *Pyramid Lake Paiute Tribe of Indians v. U.S. Department of Navy,* 898 F.2d 1410, 1415 (9th Cir.1990). Here Plaintiffs have failed to show that the Service failed to take into account new information which challenges the opinion issued by the Fish and Wildlife Service analysis.

As to the claim that the Forest Service failed to use the best scientific and commercial data available, the court again looks to the expert in this area, the United States Fish and Wildlife Service. For instance, in its July 18, 1989, biological opinion, the Service states:

> Using the scientific literature, standards and guidelines were developed (Appendix C) to coordinate Forest activities with the biological needs of the grizzly bear....

---

**3.** Plaintiffs make much of the fact that subsequent opinions were issued after the Regional Forester approved the Flathead Forest Plan. However, as the Defendants point out, the original Forest Plan is dated December 1985 and was approved by the Regional Forester in January of 1986. The original plan included a set of grizzly bear guidelines to protect that species. The original plan did not reference interagency grizzly bear guidelines because they were not published until November 26, 1986. Plaintiff environmental groups appealed the original plan, and the Chief of the United States Forest Service directed his agency to amend the plan to incorporate the subsequently issued Interagency Grizzly Bear Guidelines. The Forest Service did so, and on February 22, 1989, the Fish and Wildlife Service issued a "no jeopardy" biologi-

cal opinion on several draft plan amendments, including the plan amendment No. 9 providing additional grizzly bear protection.

On July 18, 1989, the Fish and Wildlife Service issued an amended biological opinion which considered the effects of the plan as amended. This opinion requires subsequent ESA consultation before any site specific action can be taken. According to the Fish and Wildlife Service, in its biological opinion of July 18, 1989, it believed then that "if both the Forest Service Plan standards and guidelines are consistently adhered to, the Forest Plan is not likely to adversely affect the grizzly bear ... thus, the no jeopardy conclusions reached in the 1985 and 1989 biological opinions on the Forest Plan and Plan Amendments are therefore unchanged by this amendment."

In developing the Forest Plan, grizzly bear standards and guidelines, the best scientific and commercial data available was used as well as the professional judgments of biologists from the Forest Service, Fish and Wildlife Service, and the Montana Department of Fish, Wildlife, and Parks. USFWS Biological Opinion, at 23–24 (July 18, 1989).

Based on the Fish & Wildlife Service's review, as well as the court's own independent review of the data and literature used by the Forest Service, the court finds the agency complied with the requirement that it use the best scientific and commercial data available.[4]

WATER QUALITY CLAIMS

■ Plaintiffs argue under counts two, three, and four that the Forest Service analysis of sediment impacts was inadequate; that the analyses of the effects of unstable soils and effects on trout fisheries were inadequate; that the proposed measures adopted by the Forest Service to mitigate impacts on the watershed and the fisheries were inadequate; and that the evaluation of watershed conditions was inadequate.

Keeping in mind that the standard of review for an EIS and final land use plan are deferential, the court, after careful review of those sections of the plan and EIS which pertain to water quality and fisheries values, finds that the Forest Service has given adequate consideration under the law to the water and fisheries resources and has provided substantial protection for the same. As Defendant Intervenor IFIA points out, the Forest Plan directs that each and every project level action on the Flathead National Forest must meet or exceed the State of Montana's water quality standards, or the project will be redesigned, rescheduled or dropped. In addition, the plan requires that Best Management Practices be utilized to minimize erosion and sedimentation. Such practices include, but are not limited to, maintenance and protection of designated riparian management areas. The Plan also requires sedimentation modelling if projects are proposed along important bull trout streams and requires that sediment levels be held to a level that does not pose a significant threat of sediment in spawning and rearing habitat.

Plaintiffs complain that the EIS does not adequately evaluate the sediment impacts of the Forest Plan on water quality and fishery resources because it did not quantitatively estimate the increase in sediment loads resulting from the Plan, it did not assess the effects of these sediment loads on fisheries and water quality, and it did not assess the effectiveness of the Plan's mitigation measures.

Plaintiffs would have the Forest Service produce an EIS enormous in size and complexity. As it stands now, the EIS is 1,000 pages of material and data which analyzes the goals and objectives for the proposed Forest Plan. The Forest Service readily admits that the analysis does not include site-specific considerations as those kinds of analyses will be done at the project level. This concession is at the heart of many of the arguments between the parties over the adequacy or inadequacy of the EIS and Forest Plan. The court finds, however, that by necessity, the agency must delay detailed analysis and discussion of possible effects until a specific proposal for action at a specific site is set forth. *See Natural Resources Defense Counsel, Inc. v. Hodel*, 819 F.2d 927, 930 (9th Cir.1987) (upholding District Court's determination that neither NEPA nor federal regulations require inclusion of site-specific estimates of grazing capacity in the EIS).

TIMBER HARVEST CLAIMS

■ Plaintiffs allege in count seven that the Forest Plan violates the National Forest Management Act because it fails to demonstrate that clearcutting is the optimum harvest method in the Flathead Forest Plan. Again, plaintiffs are premature in this claim at this stage of the planning process. The Forest Plan is required to

---

4. The court considers in a separate opinion the issue of whether the United States Fish & Wildlife Service complied with the best data requirement when it issued its no jeopardy biological opinion.

describe the "proportion of probable methods of harvest." 16 U.S.C. § 1604(f)(2). It does not require the Plan finally determine timber harvesting methods. Significantly, NFMA requires that when the Forest Service is about to authorize a sale, it is required to determine whether clearcutting is the optimum method to meet the objectives and requirements of the relevant land management plan. 16 U.S.C. § 1604(g)(3)(F)(i). It follows then, that the "optimum method" determination is a decision made with reference to the Forest Plan, and hence the decision must be a post-plan decision.

■ Plaintiffs allege in count eight of their complaint that the Plan violates the requirement of NFMA by failing to describe the timber sale program in appropriate written materials because the Plan does not provide a map showing possible locations of proposed sales, but instead provides information in tabular form. Plaintiff's claim is not well taken and borders on the edge of frivolous. The Plan is not unlike many prepared throughout the country. It contains management area designations that identify the types of future actions permissible within certain areas. The management area designations are displayed on a map which accompanies the management plan. In addition, the plan contains a detailed seventeen-page description on the tentative ten-year timber sale offering. This table provides a township and range legal description for areas where a timber sale may occur. This description can in turn be keyed to the maps provided with the Plan. Finally, the maps for each geographical unit show in grey the areas considered by the Plan to be suitable for timber harvest. Accordingly, the public has sufficient notice and information to determine where timber sales may be conducted through the materials provided.

## RANGE OF ALTERNATIVES

■ Plaintiffs, in counts nine through eleven, challenge the adequacy of the Forest Plan EIS range of alternatives. Plaintiffs contend that the EIS is deficient in that it does not address an alternative featuring selection (uneven-aged) management as the primary timber harvest method; it does not present a cost-efficient alternative to maximize economic value; and it uses unrealistic timber prices and harvest costs to assess the alternatives considered in the plan.

As this court has previously observed in *Idaho Conservation League v. Mumma*, a rule of reason controls the agency's determination in deciding which alternatives to consider:

> The range of alternatives ... is governed by a 'rule of reason' that requires an agency to set forth only those alternatives necessary to permit a reasonable choice ... As with the standard employed to evaluate the detail that NEPA requires in discussing a decision's environmental consequences, the touchstone for our inquiry is whether an EIS's selection and discussion of alternatives fosters informed decision-making and informed public participation.

*Idaho Conservation League*, slip op. at 14, (citing *California v. Block*, 690 F.2d 753, 764 (9th Cir.1982)). In this case, the Forest Service is not required to set forth every conceivable alternative. The EIS considers seventeen alternatives which provide the public with a wide array of forest plan alternatives emphasizing (or maximizing) different resource outputs. For instance, included in the range of alternatives was alternative five which was developed by a coalition of conservation organizations and which emphasizes protection of roadless areas and wildlife habitat. On the other hand, alternatives two and six emphasized timber management. The court finds that the Forest Service's consideration of alternatives was in fact adequate, and the court will not substitute its judgement for that of the agency. *Lathan v. Brinegar*, 506 F.2d 677, 692–93 (9th Cir.1974).

Similarly, the court is not persuaded that the agency failed to consider adequately cost-efficient alternatives. Plaintiffs argue:

> Timber sales that cost more to administer than the amount of money returned to the federal treasury as a result of the

sale, are under increasing scrutiny by both Congress and the Forest Service. The Forest Service itself has recognized that it cannot assume that Congress will continue to permit subsidies to the timber industry through below-cost sales and that forest plans should include justifications for continuing or expanding timber sale programs that lose money.... Under these circumstances, the Forest Service must at least generate and consider a forest plan alternative where the timber harvest level is based upon basic economic principles of having the timber sale program pay its own way, for such an alternative is an eminently reasonable one.

*Sierra Club,* Reply Brief at 59.

The Ninth Circuit has previously considered the issue of whether Congress has mandated that the National Forests be managed on an economically efficient basis and found that no such requirement exists. *Thomas v. Peterson,* 753 F.2d 754 (9th Cir.1985). In *Thomas,* environmental plaintiffs challenged a timber sale on the grounds that their own study, as well as the Forest Service's analysis, showed that the value of the timber to which the proposed road would provide access was less than the cost of the road which, according to the plaintiffs, violated NFMA. The court found that the Forest Service had interpreted "economical" to permit consideration of benefits other than timber access, such as motorized recreation, firewood gathering, and access to the area by local residents. This interpretation, the court determined, is "entitled to substantial deference, ... and will be upheld unless unreasonable ..." *Id.* at 762. The court found that the agency's interpretation was in fact reasonable and pointed out that while "Forest Service regulations, Congressional committee reports, Congressional testimony, unenacted bills, and Forest Service practices evince a concern for economically efficient management of the National Forests, for avoiding costs not justified by benefits, for obtaining fair market value in the sale of National Forest resources, and for recovery of the costs of National Forest roads and other management expenses ...

these sources merely counsel economic prudence. They do not evidence a statutory requirement that timber roads be built only when the proceeds of the timber sales will defray construction costs." *Id.*

Although it may have been within the Forest Service's discretion not to consider the "cost-efficient" alternative recommended by plaintiffs in this case, the court notes that the agency did in fact consider cost-efficient alternatives. Alternative four was designed to manage the Flathead Forest as a business allowing resources to be extracted where it is cost effective to do so. Alternative six was designed to maximize the net present value of the Forest while producing high outputs for all commodity resources, and alternative nine was designed to maximize the wilderness resource, and to provide the greatest amount of revenue for the least cost from the remaining lands. EIS Volumes I and II at B–128 and II–45 respectively.

█ Plaintiffs also complain that the EIS is inadequate on the ground that it did not include an alternative featuring selection timber management also known as uneven-aged management. *See* 36 C.F.R. § 219.3 (defining the two principal types of forest management systems—even-aged and uneven-aged management). The Forest Service found that even-aged management would achieve several important objectives of the forest plan, while uneven-aged management would not. The EIS states "[T]he Flathead contains natural ecosystems where plant and animal species have evolved and adapted to even-aged forest mosaics created by fire. Scientific literature and past experience indicate that attempts to impose widespread uneven-aged management in these natural ecosystems will be ecologically and ultimately economically unsound." EIS Vol. I at I–8. As previously stated, where a decision is particularly within the area of expertise of an agency, this court is reluctant to disturb that decision unless clearly unreasonable. Here, silvicultural management is within the expertise of the Forest Service, and the EIS how and why the agency made a rea-

soned decision on the method of harvest to use.

■ Finally, plaintiffs challenge the underlying assumptions utilized by the agency in developing its EIS alternatives. Plaintiffs maintain that the Forest Service projected timber costs to rise to artificially high levels while keeping costs the same, thus creating false assumptions which ultimately favored the selected alternative.

It appears from the EIS, however, that the agency undertook extensive economic analysis to evaluate the cost-efficiency of the alternatives considered in the Forest Plan. The agency originally utilized the Timber Assessment Market Model used in the 1980 Renewable Resource Program[5] report to Congress. EIS Vol. II at B–214. In 1985, when RPA report was submitted to Congress, the timber research indicated lower timber price trends. *Id.* The final EIS disclosed this new information and considered the effects of the new trends on the present net value of the preferred alternative. *Id.* at B–214 to 221. The agency found on the basis of its review of the new information that the evaluation of the alternatives was not significantly affected by the change in timber price trends. *Id.* Finally, the Forest Service did not assume that it could sell timber at an ever-increasing price. It assumed that there would be no price increase for timber after the fifth decade (EIS at B–55) and it used present net value to discount future prices and costs in the analysis. The agency did in fact determine that general administrative costs were assumed to be fixed costs and therefore were not included in the FOR-PLAN computer model. EIS at Appendix B–60. The court does not find this determination unreasonable or that it significantly affected the agency's decision to select the chosen alternative.

## CUMULATIVE EFFECTS ANALYSIS

Plaintiffs allege in the twelfth and final claim that the EIS did not adequately address the cumulative effects on the grizzly bear caused by non-federal actions and effects caused by roads on Forest Service lands.

Defendants argue, however, that the agency has no NEPA obligation to address the effects of non-federal actions as NEPA case law allows an EIS to be restricted to actions over which the federal agency has jurisdiction. Defendant Intervenor IFIA Brief in Support of Motion for Summary Judgment at 64 *citing Sylvester v. U.S. Army Corps. of Engineers,* 871 F.2d 817 (9th Cir.1989); *Enos v. Marsh,* 769 F.2d 1363, 1371–72 (9th Cir.1985); *Winnebago Tribe of Nebraska v. Ray,* 621 F.2d 269, 272–73 (8th Cir.), *cert. denied,* 449 U.S. 836, 101 S.Ct. 110, 66 L.Ed.2d 43 (1980). Plaintiffs respond that this position conflicts with CEQ regulations implementing NEPA which requires that cumulative impacts include past, present, and reasonably foreseeable actions regardless of what agency (federal or non-federal) or person undertakes such other actions. 40 C.F.R. § 1508.7.

■ The court finds that a review of the regulatory scheme shows that *in determining the scope of an EIS,* an agency must consider and discuss the cumulatively significant actions and impacts. *See Citizens For Environmental Quality v. U.S.,* 731 F.Supp. 970, 995 (D.Colo.1989). Here, non-federal land uses were not identified as a major issue during the scoping process, apparently due in part to the lack of control over the non-federal lands and because of the small amount of grizzly bear habitat on state and private lands. EIS Vol. II at A–6 to 18, and E–5, n. 3. Nevertheless, the Forest Service did consult with landowners and reviewed state land management and zoning direction. *Id.* In addition, the agency determined that further discussions and cooperative ventures would occur in order to preserve grizzly bear habitat. *Id.*

The court therefore finds that the EIS is not defective or inadequate in its discussion

---

**5.** 16 U.S.C. § 1602 requires that the Secretary of Agriculture prepare and transmit to the President every five years a recommended Renewable Resource Program which program shall include alternatives for the protection, management, and development of the National Forest System.

or treatment of cumulative effects where grizzly bears or their habitat is involved.

Nor is the court persuaded that the EIS must be remanded to the Forest Service to reconsider the cumulative effects of road density on the grizzly bear. The court agrees with the Defendants that consideration of this issue is premature. The Forest Plan does not make an "irretrievable commitment" to the construction of these roads. The Plan is exactly that, a tool to project future uses in general areas. The Forest Plan EIS need not become a substitute for site-specific NEPA analysis at the project level when a specific project is proposed for a specific area. Moreover, to the extent that the agency may be required to consider general impacts associated with the Plan, the court finds that the agency fulfilled its obligation. The EIS contains discussion of the impacts of unrestricted roads and road closures on water quality and fisheries, impacts of road management decisions on grizzly bear and wolves, the forest-wide environmental consequences of road management, and the long term cumulative effects of roads associated with each land use alternative. EIS at II–106, IV–40 to 41, IV–116, ii–73, 105, IV–33, and B–46.

CONCLUSION

As noted above, the Forest Service is faced with a nearly impossible task of serving many different interests. Here, the agency, after considerable review, analysis, and public involvement, chose an alternative to manage the Flathead National Forest, which attempts to strike some kind of reasonable balance between and among all of the competing uses. Plaintiffs are dissatisfied because the selected alternative was not their alternative. But it is not for the courts to decide whether the decision by an agency was necessarily the best one, or one the court would have chosen. Rather, the issue for the court is to determine whether the agency considered the relevant factors and made a reasoned judgment based on those considerations. The court finds the Forest Service considered the factors relevant to making an informed and reasoned decision in selecting alternative

# 17 as the alternative to manage the Flathead National Forest. Accordingly,

IT IS HEREBY ORDERED that Plaintiffs' motions for summary judgment are DENIED, and Defendants' motions for summary judgment are GRANTED as to all claims. The clerk shall enter final judgment consistent with this order.

The clerk is directed forthwith to notify counsel of entry of this order.