**CALIFORNIA TROUT, a California non-profit corporation, Plaintiff–Appellant,**

v.

**Kurt A. SCHAEFER, Lt. Col., Acting Director, U.S. Army Corps of Engineers, Sacramento District; Henry J. Hatch, Lt. General, Chief, U.S. Army Corps of Engineers; Stockton East Water District, Defendants–Appellees.**

No. 93–17160.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 4, 1995.

Decided June 26, 1995.

470

Joseph Brecher, Oakland, CA, for plaintiff-appellant.

Andrea Nervi Ward and Lisa E. Jones, U.S. Dept. of Justice, Washington, DC, for federal defendants-appellees.

Steven Herum, Jeanne M. Zolezzi, Neumiller & Beardslee, Stockton, CA, for Stockton East Water Dist., defendants-appellees.

Before: BRUNETTI, THOMPSON and HAWKINS, Circuit Judges.

**DAVID R. THOMPSON, Circuit Judge:**

California Trout (CalTrout), a nonprofit environmental organization, challenges the United States Army Corps of Engineers' (the Corps) decision to approve an application by the Stockton East Water District (SEWD) for a permit under section 404 of the Clean Water Act, 33 U.S.C. § 1344. SEWD sought a permit to discharge fill material into wetlands under the jurisdiction of the United States in conjunction with SEWD's construction of a larger project to divert water from the Stanislaus River in California's Central Valley.

CalTrout contends the Corps violated the National Environmental Policy Act (NEPA), 42 U.S.C. § 4331, et seq., and the Clean Water Act, 33 U.S.C. § 1344, by, *inter alia,* excluding from the scope of its permit review the entire project's environmental effects on fisheries downstream in the Stanislaus River. The district court granted the Corps's and SEWD's motions for summary judgment, and this appeal by CalTrout followed. We affirm.

## FACTS

SEWD has constructed a 41–mile long project to divert water from the Stanislaus River in the northern portion of California's Central Valley to SEWD's water treatment plant east of Stockton, California.

The New Melones Reservoir, which is the source of the water to be diverted, is controlled by the Bureau of Reclamation, United States Department of Interior (the Bureau). As part of its oversight, and pursuant to congressional direction, the Bureau has conducted studies and prepared environmental impact statements (EIS) to ensure that the allocation of New Melones water is "at all times ... subordinate" to the quantities of water required "to satisfy all existing and future needs within [the Stanislaus River] basin," and that "appropriate measures" are adopted to "insure the preservation and propagation of fish and wildlife." Flood Control Act of 1962, Pub.L. No. 87–874, 76 Stat. 1180, 1191. These studies include an EIS issued in 1972, and a supplemental EIS issued in 1980.

In addition, several studies are currently examining the impact on Stanislaus River fisheries of water allocations from the New Melones Reservoir. The Bureau, along with the U.S. Fish and Wildlife Service (FWS) and the California Department of Fish and Game (DFG), is conducting a multi-year study of the instream flow requirements and other needs of the fisheries. In addition, the Bureau and DFG are jointly developing a long-term water use plan for the Stanislaus and Calaveras Rivers that will, in part, "[p]rovide increased instream flows for fishery and wildlife needs" in those rivers. The Bureau and DFG are preparing an EIS in conjunction with that study, as required by the Central Valley Project Improvement Act (CVPIA). *See* Pub.L. No. 102–575, § 3406(c)(2), 106 Stat. 4706, 4722 (1992) (requiring that the Bureau complete the EIS by September 30, 1996 and in so doing "evaluate and determine existing and anticipated future basin needs in the Stanislaus River Basin," including "fish and wildlife resources").

In 1983, SEWD entered into an interim water supply contract with the Bureau. The Bureau agreed to provide SEWD with a maximum of 75,000 acre-feet of water annually, subject to availability after the Bureau satisfied the water needs of in-basin users and higher priority out-of-basin users.

In early 1988, the California State Water Resources Control Board (State Water Board) approved the Bureau's application to divert water at New Melones and downstream on the Stanislaus River for diversion by SEWD. As a condition of approving the Bureau's water contracts, the State Water Board required the Bureau to maintain instream flow needs to protect fisheries and instructed the Bureau to conduct instream flow and fisheries studies. The Board retained jurisdiction over the Bureau's permit in order to revise instream flow requirements for water quality objectives and fishery purposes.

In 1989, SEWD started building its 41–mile conveyance system to divert water from the Stanislaus River. The conveyance system consists of a diversion structure at Goodwin Dam, a 3.3–mile tunnel, a 10–mile Upper Farmington Canal, improvements in Shirley,

Hoods, and Rock creeks to utilize their 16 miles of natural watercourses, a rediversion structure at Rock Creek, the 8.6–mile Lower Farmington Canal, and a 3.2–mile buried pipeline. Prior to commencing construction, SEWD issued an Environmental Impact Report for the "Farmington Canal Project," as required by California state law, which encompassed the Farmington Canal, as well as other features of the project.

In 1990, SEWD applied to the Corps for a permit under section 404 of the Clean Water Act to discharge fill material into water of the United States (wetlands), in connection with building one of the conveyance system components—the rediversion structure within Rock Creek, just below the Farmington Dam. No other portion of the project required federal approval. The Corps determined that 4.18 acres of wetlands within the Corps's jurisdiction would be affected by the construction of the Rock Creek facility.

Pursuant to NEPA, the Corps prepared an Environmental Assessment (EA), granting the permit to SEWD and responding to concerns from third parties. The Corps's sister agencies, including FWS, the Environmental Protection Agency (EPA), and the National Marine Fisheries Service (NMFS), were initially concerned about the impact the water diversion might have on the fisheries in the Stanislaus River. The Corps explained that SEWD's permit application was not the appropriate forum for resolving the fishery issues, based on (1) the Bureau's control over the allocation of water; (2) the separate contracts between the Bureau and SEWD governing water allocation; (3) and the environmental impact statements and other studies the Bureau had performed in the past, and currently was performing, concerning the fisheries. The Corps concluded that "[s]ufficient guarantees are in place to ensure that if studies indicate that additional flows are needed in the Stanislaus River, the Bureau will operate the New Melones reservoir accordingly."

On October 26, 1992, CalTrout filed this lawsuit claiming that the Corps violated NEPA and the Clean Water Act when it issued the section 404 permit to SEWD.

The Corps and SEWD moved for summary judgment, which the district court granted on August 27, 1993. This appeal followed.

In the meantime, construction of the entire project, including the Rock Creek facility, has been completed.[1] However, to date, the Bureau has denied SEWD's requests for water, in order to preserve supplies for higher-priority users, and no water has been diverted from the Stanislaus River to East Stockton. The 41–mile conveyance system, although completely built, remains dry.

## DISCUSSION

1. Did the Corps arbitrarily and capriciously limit the scope of its NEPA analysis?

"The purpose of NEPA is to assure that federal agencies are fully aware of the impact of their decisions on the environment." *Friends of the Earth v. Hintz,* 800 F.2d 822, 836 (9th Cir.1986) (citing *Friends of Endangered Species, Inc. v. Jantzen,* 760 F.2d 976, 985 (9th Cir.1985)). To fulfill that purpose, NEPA requires all federal agencies to prepare an EIS for "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

To determine whether an EIS is necessary, the agency first prepares an EA, which briefly describes the need for, alternatives to, and environmental impacts of the proposed federal action. 40 C.F.R. § 1508.9 (1994). If the agency determines in the EA that the federal action will not significantly affect the environment, it makes a "finding of no significant impact" (FONSI), and its NEPA review ends. *Id.* § 1508.13. However, if the agency determines that the proposed action will significantly affect the environment, it then prepares a more thorough EIS concerning the project. *Id.* pt. 1502.

When the federal action is merely a component of a larger nonfederal project, the process becomes more complicated, because NEPA does not specify the scope of an agency's EA analysis. *Sylvester v. U.S. Army Corps of Engineers (Sylvester I),* 884 F.2d 394, 398 (9th Cir.1989). In the present case, the Corps determined that its jurisdiction did

---

**1.** CalTrout never sought to preliminarily enjoin construction of the project.

not extend beyond the Rock Creek rediversion structure. Accordingly, the Corps looked only at the environmental impacts resulting from SEWD's application to fill 4.18 acres of wetlands in constructing the Rock Creek facility. The Corps determined the environmental impacts were not "significant," and that an EIS was not necessary.[2]

CalTrout contends the Corps should not have limited its review to the environmental impacts of filling the 4.18 acres of wetland, the only portion of the 41–mile diversion project that required federal approval. CalTrout contends the Corps should have analyzed the environmental effects caused by the project as a whole; specifically, the effects on the fisheries in the lower Stanislaus River. CalTrout reasons that because the nonfederal portions of the project are dependent on the Rock Creek facility, the entire project constitutes a single federal action, and should be analyzed as such.

■ We review the Corps's decision not to prepare an EIS under an "arbitrary and capricious" standard of review. *Greenpeace Action v. Franklin,* 14 F.3d 1324 (9th Cir. 1992). Using this standard, we consider only whether the Corps's decision is based on a "reasoned evaluation of the relevant factors." *Id.* at 1332. We will overturn the Corps's decision only if the Corps committed a "clear error of judgment." *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 378, 385, 109 S.Ct. 1851, 1865, 104 L.Ed.2d 377 (1989).

As both CalTrout and the Corps point out, the cases on which they rely are not on all fours with our facts, primarily because these cases lack the presence of a second, more involved federal agency. *Compare, e.g., Sylvester v. U.S. Army Corps of Engineers (Sylvester I),* 884 F.2d 394, 398 (9th Cir.1989) (relied on by the Corps); *Thomas v. Peterson,* 753 F.2d 754 (9th Cir.1984) (relied on by CalTrout).

However, *North Carolina v. City of Virginia Beach,* 951 F.2d 596 (4th Cir.1991), is a strikingly similar case, and its reasoning,

which we find persuasive, disposes of the central issue in this case. In *North Carolina,* the City of Virginia Beach sought to build an 85–mile pipeline to divert water from Lake Gaston. *Id.* at 598. Virginia Beach had already obtained a permit from the Corps. The Corps issued an EA and a FONSI; an EIS was never prepared. *Id.* at 599. The City still needed approval from the Federal Energy Regulatory Commission (FERC), which is the licensor of the hydropower facility at Lake Gaston. *Id.*

The plaintiffs sued to enjoin the project, contending that FERC could not issue the necessary approvals until it reviewed the entire pipeline project under NEPA, because the approvals were a condition precedent to the pipeline. *Id.* at 604.

Framing the issue in the case as "whether the NEPA assessment conducted by the Corps must be repeated by FERC," the Fourth Circuit examined whether FERC had "veto" power over other parts of the pipeline. *Id.* at 604. The court concluded FERC did not, noting that "[i]ndeed, if Virginia Beach were to build a pipeline, or any structure for that matter, up to the edge of Lake Gaston, it is doubtful that FERC would have any say in the matter." *Id.* The court also noted the lack of federal funding and that apart from FERC's permitting decision, the only federal involvement was the Corps's, "which ha[d] already provided an environmental assessment to the fullest extent required by NEPA." *Id.* at 604–05.

The *North Carolina* court emphasized what the case was not about:

This is not a case in which we are asked to permit construction on property under FERC jurisdiction without a NEPA review; nor has Virginia Beach sought to initiate construction to bypass a NEPA review. On the contrary, ... FERC will and should conduct a NEPA review in connection with [its portion of the project]. Moreover, [for the rest of the property], over which FERC has no jurisdiction, the

2. As a condition to the permit, the Corps required SEWD to mitigate any adverse environmental effects caused by filling in the wetlands. These requirements included creating nine acres of replacement wetlands—more than twice the amount that would be lost from the Rock Creek project.

NEPA requirements were previously satisfied by the Corps. *Id.* The court concluded that FERC's limited analysis was "consistent with the authority exercised by the Corps." *Id.* at 605.

■ We adopt the view of the Fourth Circuit in *North Carolina,* and hold that in this case the Corps properly limited its scope of review to SEWD's activities in filling in the 4.18 acres of wetlands.

The Corps's justification for limiting its review in this case is substantially the same as FERC's justification for limiting its review in *North Carolina. See id.* at 604. In *North Carolina,* it was the Corps, not FERC, that had the right and the obligation to protect the environment. Here, it is the Bureau, not the Corps, which has the contractual right, and statutory obligation, to curtail SEWD's contractual allocations as necessary to protect the needs of the fisheries. The Corps has no jurisdiction over the amount of water, if any, the Bureau may decide to divert. Moreover, the entire project in the present case is privately funded just as it was in *North Carolina. See id.*

Most important, the Bureau has already fulfilled the NEPA mandate by preparing an EIS "to the fullest extent required by NEPA." *See id.* at 604–05; *see also Environmental Defense Fund, Inc. v. Armstrong,* 356 F.Supp. 131, *aff'd,* 487 F.2d 814 (9th Cir.1973) (upholding Bureau's EIS). The SEWD project, and its effects on the downstream fisheries, have been the subject of at least four in-depth governmental studies, all of which were followed by extensive public review and comment. Moreover, those studies, at congressional behest, are currently being updated by the Bureau. Requiring the Corps to duplicate these efforts would be nonsensical. *See Enos v. Marsh,* 769 F.2d at 1371 n. 10 (finding fact that state prepared an EIS for its shoreside facilities persuasive in affirming Corps's review of only the federal harbor aspect of the project); *cf. Sylvester I,* 884 F.2d at 401 ("[O]rdinary notions of efficiency suggest a federal environmental review should not duplicate competently performed state environmental analyses.").

Our holding does not conflict with Ninth Circuit precedent. *Sylvester I, supra,* and *Thomas v. Peterson, supra,* are inapposite, because neither involved the concurrent yet independent jurisdiction of two federal agencies. Unlike *Sylvester,* here CalTrout is not concerned that the nonfederal aspects of the project will escape NEPA scrutiny. Instead, it seeks "a second bite" at NEPA by requiring the Corps to reprise the Bureau's EIS. Also, unlike *Thomas,* here the Corps does not control the entire project, nor does it seek to segment the project to avoid an EIS—an EIS has already been performed, as have a number of other studies.

■ Focusing on the limited review the Corps did perform, CalTrout argues the Corps failed to use the same "scope of analysis for analyzing both the impacts and alternatives [as it] used for analyzing the benefits of" the SEWD project. Corps NEPA Regulations, ¶ 7(b)(3). We rejected a similar argument in *Sylvester v. U.S. Army Corps of Engineers (Sylvester II ),* 882 F.2d 407 (9th Cir.1989).

In *Sylvester I,* we upheld the Corps's decision to review the environmental impact of a golf course, and to exclude the impact of an adjoining resort complex. *See* 884 F.2d at 400–01. Then, in *Sylvester II,* the same plaintiff contended the Corps violated paragraph 7(b)(3) when it "limited its consideration of the impact of the proposed development to only those of the golf course while simultaneously including the benefits from the entire resort complex." 882 F.2d at 410. We upheld the Corps, because "[t]he EA makes plain that the Corps followed its regulations and weighed only the benefits of the golf course to the resort." *Id.* We found that "[t]he Corps quite properly did measure the benefit of the golf course in terms of its contribution to making the resort an economically viable year-round facility with all of its attendant advantages." *Id.*

As in *Sylvester II,* here the Corps did not violate paragraph 7(b)(3). The Corps did not "weigh the benefits of the entire project against the environmental impacts of the" Rock Creek facility. *See id.* Rather it simply weighed the benefits of the Rock Creek facility to the water diversion. *See id.*

CalTrout's last argument, that the Corps failed to analyze the impact of the diversion on growth in the Stockton area, also fails. CalTrout disregards the findings supporting the Corps's conclusion that no significant growth would result from the diversion and fails to explain how the Corps "committed a clear error of judgment." Accordingly, we defer to the Corps's "reasonably thorough" findings that no growth would result from the project. *Laguna Greenbelt, Inc. v. U.S. Dept. of Transportation,* 42 F.3d 517, 526 (9th Cir.1994).[3]

**2. Did the Corps violate the Clean Water Act?**

 CalTrout contends the Corps failed to consider the views of the U.S. Fish and Wildlife Service, the National Marine Fisheries Service, and state fish and game officials. *See* 33 C.F.R. § 320.4(c) (1994). We disagree. In contrast to *Sierra Club v. U.S. Army Corps of Engineers,* 701 F.2d 1011, 1031 (2d Cir.1983), cited by CalTrout, here the Corps responded to the agencies' concerns. *Compare Sierra Club,* 701 F.2d at 1031 (criticizing the Corps for failing "to react in any way to sister agencies' pointed comments that the draft EIS did not provide adequate information"). Moreover, CalTrout exaggerates the level of interagency disagreement. The U.S. Fish and Wildlife Service eventually agreed that the Corps should limit its review to the Rock Creek impacts. In addition, neither the Environmental Protection Agency nor the National Marine Fisheries Service administratively challenged the Corps's scope of review. As required, the Corps considered these agencies' initial concerns, addressed them, and "explained why it found them unpersuasive." *Roanoke River Basin Assoc. v. Hudson,* 940 F.2d 58, 64 (4th Cir.1991), *cert. denied,* 502 U.S. 1092, 112 S.Ct. 1164, 117 L.Ed.2d 411 (1992). CalTrout has failed to show the Corps acted arbitrarily or capriciously in doing so. *Compare Sierra Club,* 701 F.2d at 1023–24 (agen-

cies requested reconsideration of the permitting decision multiple times, and appealed the decision administratively).

CalTrout also criticizes the Corps's finding that SEWD's fill activities would not cause or contribute to significant degradation of the waters of the United States. 40 C.F.R. § 230.10(c) (1994). We understand CalTrout's argument but reject it. CalTrout may disagree with the Corps's finding, but there is nothing in the record to suggest that finding resulted from any clear error of judgment. The Corps's action in issuing the permit to SEWD under the Clean Water Act was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *See Friends of the Earth,* 800 F.2d at 831.

AFFIRMED.

---

**3.** Other NEPA issues CalTrout raises, including its contentions that the Corps (1) improperly relied on obsolete fisheries data in preparing the EA; (2) disregarded the cumulative impact of the water diversion; and (3) improperly relied on the Bureau's EIS, are mooted by our resolution of the broader scope of review issue.