222 F.3d 1105 (9th Cir. 2000)
 WETLANDS ACTION NETWORK, a California non-profit organization; BALLONA WETLANDS LAND TRUST, a California non-profit organization, Plaintiffs-Appellees,
v.
UNITED STATES ARMY CORPS OF ENGINEERS, an agency of the United States; MICHAL R. ROBINSON, in his capacity as District Engineer of the United States Army Corps of Engineers; JOE N. BALLARD, in his capacity as Chief Engineer of the United States Army Corps of Engineers, Defendants,
and
PLAYA CAPITAL COMPANY, L.L.C., as successor-in-interest to Maguire Thomas Partners-Playa Vista, DefendantIntervenorAppellant.
WETLANDS ACTION NETWORK, a California non-profit organization; CALIFORNIA PUBLIC INTEREST RESEARCH GROUP, Plaintiffs-Appellants,
and
BALLONA WETLANDS LAND TRUST, a California non-profit organization, Plaintiff,
v.
UNITED STATES ARMY CORPS OF ENGINEERS, an agency of the United States; MICHAL R.ROBINSON, in his capacity as District Engineer of the United States
Army Corps of Engineers; JOE N. BALLARD, in his capacity as Chief Engineer of the United States Army Corps of Engineers, Defendants,
And
PLAYA CAPITAL COMPANY, L.L.C., as successor-in-interest to Maguire Thomas Partners-Playa Vista, Defendant-Intervenor-Appellee.
WETLANDS ACTION NETWORK, a California non-profit organization; BALLONA WETLANDS LAND TRUST, a California non-profit organization; CALIFORNIA PUBLIC INTEREST RESEARCH GROUP, Plaintiffs-Appellees,
v.
UNITED STATES ARMY CORPS OF ENGINEERS, an agency of the United States; JOE N.BALLARD, in his capacity as Chief Engineer of the United States Army Corps of Engineers; ROBERT L. DAVIS, Col., Defendants-Appellants.
 Nos. 98-56242, 98-56474, 98-56672
 
 Office of the Circuit Executive
 U.S. Court of Appeals for the Ninth Circuit
 Argued and Submitted May 4, 1999--Pasadena, California
Filed August 21, 2000
 [Copyrighted Material Omitted][Copyrighted Material Omitted]
 Robert D. Crockett, Charles S. Treat, Leslie A. Pereira, Robert D. Crockett, Adam H. Braun, Latham & Watkins, Los Angeles, California, for appellant Playa Capital Company, L.L.C., successor-in-interest to Maguire Thomas Partners-Playa Vista.
 Charles S. Crandall, San Diego, California, and David H. Williams, Public Interest Lawyers Group, San Francisco, California, for appellees, Wetlands Action Network and California Public Interest Research Group.
 Anthony P. Hoang, Robert L. Klarquist, Mark R. Haag, DAG, Washington, D.C., John Gleason, U.S. Army corps of Engineers, Ventura, California, and Lyn Cox, Office of Regional Solicitor, Department of Interior, Sacramento, California, for appellants-cross-appellees, United States Corps of Engineers.
 Andrew R. Henderson (argued), Carlyle W. Hall, Jr., Hall & Associates, Los Angeles, California, for amicus Friends of Ballona Wetlands.
 Appeals from the United States District Court for the Central District of California, D.C. No. CV-96-08407-RSWL; Ronald S. W. Lew, District Judge, Presiding
 Before: Melvin Brunetti, Kim McLane Wardlaw, Circuit Judges, and John W. Sedwick,[1] District Judge.
 BRUNETTI, Circuit Judge:
 
 
 1
 This case involves a challenge by environmental groups to the United States Army Corps of Engineers ("Corps") decision to grant Maguire Thomas Partners-Playa Vista ("MTPPV")[2] a permit to fill 16.1 acres of federally delineated wet lands and to mitigate the fill by creating a 51-acre freshwater wetland system. Wetlands Action Network and California Public Interest Research Group (collectively "WAN") brought suit in the district court alleging that the Corps had failed to fulfill their legal obligations under the Clean Water Act ("CWA"), 33 U.S.C. S 1251 et seq., and the National Environmental Policy Act ("NEPA"), 42 U.S.C. S 4321 et seq., in granting MTP-PV a fill permit pursuant to section 404 of the CWA. The district court denied MTP-PV's motion to intervene as a right in the NEPA claims but granted MTP-PV's motion in the alternative for permissive intervention. The district court, however, limited MTP-PV's participation in the NEPA claims to the relief phase. MTP-PV appeals this decision.
 
 
 2
 The district court granted summary judgment to WAN on its NEPA claims, invalidated the permit, and enjoined MTPPV from any further construction activities in the area covered by the permit[3]. TheCorps appeals the district court's determination that it violated NEPA. MTP-PV appeals the district court decision to issue the injunction claiming that (1) the district court committed error by denying MTP-PV a hearing on the remedial phase of the proceedings, (2) the injunction is moot, (3) the district court erred in failing to balance the equities of a permanent injunction, and (4) the district court should not have issued the injunction as WAN is guilty of laches. WAN filed a cross-appeal claiming that the district court abused its discretion in failing to broaden the injunction in order to protect the integrity of the environment and the NEPA process during the preparation of the Environmental Impact Statement ("EIS"). We consolidated the appeals and we affirm in part and reverse in part.
 
 I.
 
 3
 Since 1979, MTP-PV and its predecessor-in-interest have been planning to build a large scale mixed use development on the Playa Vista property. The proposed development is expected to cover over 1,000 acres and include residential areas, a marina, and numerous commercial developments including hotels, retail establishments, and an entertainment media and technology district. The project has been the subject of much dispute as the Playa Vista property is the largest remnant parcel of undeveloped land in a heavily urbanized western portion of Los Angeles County[4].
 
 
 4
 The Playa Vista property contains approximately 186 acres of federally delineated wetlands. As part of its project, MTPPV plans to eventually dredge and fill 21.4 acres of wetlands. Before preparing an application for a dredge and fill permit for any of the project activities, MTP-PV met with the Corps to determine the proper division of the project for permitting purposes. MTP-PV proposed to divide the overall project into the following three separate permit applications to correspond to the three separate phases of the project:
 
 
 5
 The first phase is for authorization to fill 7.8 acres of scattered wetland patches in Areas B, C, and D[5] for mixed-use development. It also includes the creation of a 52-acre fresh water wetland complex which [MTP-PV] proposes as mitigation for a total of 21.4 acres of wetlands that would be dredged and filled for all phases of the Playa Vista project. The creation of the freshwater wetland system would require filling 7.7 acres of wetlands in Area B for the berm (4.0 acres of which would be restored to wetlands leaving 3.7 acres as permanently filled).
 
 
 6
 The second phase is for the restoration and creation of a salt marsh which would occur in 160 acres of delineated degraded wetlands in Area B. By restoring those wetlands and converting uplands to wetlands, an approximately 230-acre salt marsh system would be created.
 
 
 7
 The third is for the development of a marina and ecological enhancement of the Ballona flood control channel which will dredge and fill 9.8 acres of wetlands in Area A. Of that, 3.7 acres are a man-madedrainage ditch and 8.1 acres are scattered, degraded wetlands.
 
 
 8
 U.S. Army Corps of Engineers, Public Notice of Permit Application at 4-5 (January 2, 1991). The Corps agreed that it was appropriate to divide the overall project into three phases for permitting purposes as each of the proposed phases had independent viability.
 
 
 9
 In August 1990, MTP-PV applied to the Corps for a permit to fill 16.1 acres of federally delineated wetlands as part of Phase I of the project.[6] The eight acres proposed to be filled for multi-use development are man-made flood control ditches and degraded wetlands located in seventeen isolated patches across the Playa Vista property. The remaining eight acres, located in Area B, MTP-PV proposed to fill in order to create a 51.1 acre freshwater wetland system consisting of 26 acres of freshwater marsh and 25 acres of freshwater riparian corridor. Of the latter eight acres, four of the acres are to be restored to wetlands and the remaining four are to be permanently filled to create a berm between the freshwater wetland system and a saltwater marsh which MTP-PV plans to restore as part of Phase II of the project.
 
 
 10
 In October 1990, MTP-PV submitted an analysis of alternatives to the proposed filling of wetlands. The analysis describes six alternatives including four different configurations of the mixed-use development which avoid all or part of the wetlands as well as the possibility of using an offsite location for the development. Based on its analysis, MTP-PV concluded that there was no practical alternative way to accomplish its purpose of building an environmentally sensitive development that would not result in other significant environmental impacts.
 
 
 11
 On January 2, 1991, the Corps issued a public notice of the permit application. The notice described the activity for which the permit was requested as well as the entire Playa Vista development. The notice also included the Corps' preliminary determination that an EIS would not be required for the work proposed in Phase I of the project. The Corps solicited comments from the interested public and relevant state and federal resource agencies. The period of public review of the permit application originally was set for January 1, 1991 to February 2, 1991. The Corps extended the review period to February 15, 1991 at the request of the EPA.
 
 
 12
 The Corps received numerous comments from the general public, environmental groups, and state and federal resource agencies. In particular, the United States Fish and Wildlife Service ("FWS"), the National Marine Fisheries Service ("NMFS") and the Environmental Protection Agency ("EPA") expressed concern that, inter alia , the notice of intent and the permit application did not contain a sufficiently detailed analysis of project alternatives and did not provide a comprehensive evaluation of the cumulative impacts attributable to the entire development project.
 
 
 13
 In response to the comments received, MTP-PV submitted to the Corps comments addressing the concerns raised by FWS and NMFS. MTP-PV also submitted a revised `Practical Alternative Analysis' which contained an analysis of five alternatives to the mixed-use development portion of the project and six alternatives to the freshwater wetland system portion. To further supplement its analysis, MTP-PV also submitted three scientific studies: "Biological Value of the Ballona Wetlands System," "Water Balance for the Proposed Freshwater Wetland System," and "Water Demand of the Proposed Ballona Freshwater Wetland System."
 
 
 14
 In order to resolve the resource agencies' remaining concerns about the project, the Corps met with representatives of the FWS, NMFS, EPA, and the California Department of Fish and Game on November 7, 1991. At this meeting the agenciesexpressed concern regarding the three-permit approach to the project and requested that the Corps delay review and approval of any component of the project until MTP-PV had submitted an application for Phase II of the project.
 
 
 15
 After reviewing documentation submitted by MTP-PV addressing the agencies' concerns, the Corps found that MTPPV's responses to the comments were acceptable. The Corps determined, however, that MTP-PV would be required to provide in-kind mitigation for any salt marsh habitat lost as a result of the project.
 
 
 16
 On February 25, 1992, pursuant to CWA S 404(q), the Corps sent a first informal notice of intent to issue MTP-PV's permit to NMFS, EPA, and FWS. On April 8, 1992, the Corps met with the agencies to discuss their concerns. The agencies requested additional documentation regarding the freshwater wetlands system which MTP-PV supplied on April 17, 1992. After meeting with the Corps again on May 5, 1992, and MTP-PV on May 6, 1992, NMFS reached an agreement with MTP-PV which resolved its concerns. MTP-PV agreed to inclusion in the permit of various special permit conditions proposed by NMFS and the EPA.
 
 
 17
 On May 22, 1992, the Corps issued a second notice of intent to issue the permit which included a revised Environmental Assessment ("EA") and the modified special conditions suggested by the agencies. After receiving the requested technical information, EPA, NMFS, and FWS decided not to object further to the issuance of the permit for Phase I of the Playa Vista project.
 
 
 18
 The Corps issued the permit and special conditions along with the associated EA and Finding of No Significant Impact ("FONSI") on July 1, 1992. In the EA, the Corps found that the division of the project into three applications was a logical division and did not constitute inappropriate piecemealing of the overall project. Due to the relatedness of the three phases, however, the Corps found that it would accept mitigation credit for the future projects as part of Phase I, provided that the later phases eventually receive authorization and that the `success criteria' for the freshwater wetland system are met.
 
 
 19
 The EA also contained a discussion of alternatives to the project including: (1) no action alternative; (2) alternative project designs; (3) the creation of a salt marsh in lieu of the freshwater wetland system; and (4) possible off-site locations. The Corps ultimately determined that there were no practical alternatives to the proposed project that would result in less adverse impacts on the environment.
 
 
 20
 In the EA, the Corps evaluated the cumulative impact that the project would have on the surrounding areas. The Corps found, however, that it did not need to include substantial consideration of the development in the uplands area as part of the NEPA review of permit application because it found that such development was outside its jurisdiction. A discussion of the comments received during the public notice period was also included in the EA as well as the Corps' responses to the concerns raised.
 
 
 21
 The Corps ultimately determined that the project would result in a net increase in wetland values. After reviewing the information provided by MTP-PV and all interested parties, the Corps found that the permit action at issue would not have a significant impact on the quality of the human environment and that an EIS would therefore not be required. The Corps issued the permit. On April 20, 1993, MTP-PV executed and transmitted the permit to the Corps. Following the issuance of the permit, MTP-PV performed extensive filling, clearing, and grading in the wetlands in the permit area.
 
 
 22
 On December 3, 1996, WAN brought five claims against the Corps, four alleging violations of NEPA and the fifth alleging a violation of the CWA. WAN sought to have all construction at the site enjoined until the Corps issued an EIS as well as a preliminary injunction.
 
 
 23
 On August 22, 1997, the district court granted MTP-PV's motion to intervene as to the CWA claim. The district court denied MTP-PV's motion to intervene as of right with regard to the NEPA claims, but granted it permissive right to intervene in the remedial phase of such claims.
 
 
 24
 On November 6, 1997, the district court denied WAN's motion for a preliminary injunction finding that WAN was unlikely to succeed on the merits of its CWA and NEPA claims. We dismissed WAN's interlocutory appeal of that order on May 18, 1997. We found that because WAN had not shown a continuing cognizable injury for which the requested preliminary injunction would provide relief, the appeal of the NEPA claims was moot. On November 14, 1997, the district court granted MTP-PV's and the Corps' motion for partial summary judgment as to the CWA claim.
 
 
 25
 On June 26, 1998, the district court granted WAN's motion for summary judgment on its NEPA claims. The district court found that the Corps had violated NEPA by improperly limiting the scope of its analysis to the impacts of activities covered by the permit, rather than considering impacts associated with the whole development project. The district court further found that even if the scope of the analysis were proper, the Corps decision to issue a EA rather than an EIS was arbitrary and capricious because of the untested nature of the freshwater wetlands system, the lack of a fully developed mitigation plan, and the controversy that surrounded the Corps' determination of the permitted activities' nature and effect. The district court rescinded the permit and enjoined MTP-PV from any further construction activities in the area covered by the permit. The district court did not hold a hearing regarding the propriety of issuing an injunction in this case, and MTP-PV was therefore not allowed to enter evidence on this issue. The district court denied WAN's motion to enjoin MTP-PV from continuing work on the upland portion of its property on July 13, 1998. The final judgment issued on August 10, 1998, and the district court denied reconsideration on August 21, 1998.
 
 II.
 A. Intervention as of Right Under NEPA
 
 26
 MTP-PV appeals the district court's decision to deny its motion to intervene as of right on the merits of the NEPA claims. We review a district court's ruling on a motion to intervene as a matter of right de novo. Forest Conservation Council v. United States Forest Service, 66 F.3d 1489, 1493 (9th Cir. 1995).
 
 
 27
 To intervene as of right under Federal Rule of Civil Procedure 24(a) an applicant must claim "an interest relating to the property or transaction which is the subject of the action," the protection of which may, as a practical matter, be impaired or impeded by the action if the applicant is not allowed to participate in the litigation. See Fed. R. Civ. P. 24(a).[7] We apply the following four-part test to determine if an applicant has a right to intervene:
 
 
 28
 (1) the motion must be timely; (2) the applicant must claim a `significantly protectable' interest relating to the property or transaction which is the subject of the action; (3) the applicant must be so situated that the disposition of the action may as a practical matter impair or impede its ability to protect that interest; and (4) the applicant's interest must be inadequately represented by the parties to the action.
 
 
 29
 Sierra Club v. EPA, 995 F.2d 1478, 1481 (9th Cir. 1993).
 
 
 30
 As a general rule, "the federal government is the only proper defendant in an action to compel compliance with NEPA." Churchill County v. Babbitt, 150 F.3d 1072, 1082, as amended by 158 F.3d 491 (9th Cir. 1998); see also Forest Conservation Council, 66 F.3d at 1499; Sierra Club, 995 F.2d at 1485; Portland Audubon Society v. Hodel, 866 F.2d 302, 309 (9th Cir. 1989). "The rationale for our rule is that, because NEPA requires action only by the government, only the government can be liable under NEPA." Churchill County, 150 F.3d at 1082. Because a private party can not violate NEPA, it can not be a defendant in a NEPA compliance action. Id. Based on this rule, the district court found that MTP-PV did not assert a legally protectable interest that relates to the NEPA claims.
 
 
 31
 MTP-PV argues that the "none but a federal defendant" rule does not apply to NEPA actions involving an attack upon a permit issued to a private party. The cases on which MTPPV relies, however, do not support this proposition. For example, in Foundation for Horses v. Babbitt, 154 F.3d 1103 (9th Cir. 1998), the plaintiffs alleged that the National Park Service violated NEPA when it decided to remove a herd of horses from national park land and individual defendants were joined because of their purported interest in the horses. Contrary to MTP-PV's contention that we held that such a property interest was sufficient to remove the case from the normal rule that only the federal government should be a defendant in a NEPA suit, we found that the `normal rule' did not apply to the case because NEPA did not apply to the agency's decision to remove privately owned horses. Id. at 1106.
 
 
 32
 MTP-PV's assertion that Ninth Circuit precedent prevents us from adopting a broad interpretation of Churchill County is without merit. Specifically, MTP-PV avers that a broad reading of Churchill County would squarely conflict with County of Fresno v. Andrus, 622 F.2d 436 (9th Cir. 1980). In Churchill County, however, we addressed the issue of whether County of Fresno represents an exception to the general rule that only the federal government can be a defendant in a NEPA compliance action. We noted that"[w]hatever exception County of Fresno represents, however, has been limited by later decisions to the remedial phase of a trial." 150 F. 3d. at 1083 (citing Forest Conservation Council, 66 F.3d at 1499 n.11; Sierra Club, 995 F.2d at 1485). Churchill County is controlling here and we therefore affirm the district court's decision to limit MTP-PV's intervention in the NEPA action to the remedial phase.
 
 B. NEPA Claims
 1. Standard of Review
 
 33
 We review de novo a district court's decision to grant summary judgment. Blue Mountains Biodiversity Project v. Blackwood, 161 F.3d 1208, 1211 (9th Cir. 1998), cert. denied, 527 U.S. 1003 (1999). The Corps' decision to prepare an EA rather than an EIS is reviewed under the APA's arbitrary and capricious standard. Northwest Environmental Defense Center v. Bonneville Power Administration, 117 F.3d 1520, 1536 (9th Cir. 1997). The arbitrary and capricious standard requires a court "to ensure that an agency has taken the requisite `hard look' at the environmental consequences of its proposed action, carefully reviewing the record to ascertain whether the agency decision is `founded on a reasoned evaluation of the relevant factors.' " Greenpeace Action v. Franklin, 14 F.3d 1324, 1332 (9th Cir. 1993) (quoting Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 373-74, 378 (1989)) (internal quotations omitted). This standard of review is deferential: we cannot substitute our judgment for that of the agency. City of Carmel-By-The-Sea v. U.S. Dep't. of Transp., 123 F.3d 1142, 1150-51 (9th Cir. 1997). The agency's decisionwill only be overturned if the agency committed a "clear error in judgment." Northwest Environmental Defense Center, 117 F.3d at 1536 (quoting Marsh, 490 U.S. at 378, 385) (internal quotation marks omitted).
 
 2. Scope of NEPA Analysis
 
 34
 a. Major Federal Action
 
 
 35
 NEPA requires a federal agency to prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. S 4332(2)(C). "The NEPA does not specify the scope of analysis that federal agencies must conduct in determining whether their actions, when combined with private actions, come within the mandate of S 4332(2)(C)." Sylvester v. U.S. Army Corps of Engineers, 884 F.2d 394, 398 (9th Cir. 1989). The Corps' NEPA implementing regulations, which we upheld in Sylvester, 884 F.2d at 399, require that, where the activity requiring a DA permit is "merely one component of a larger project," the Corps "address the impacts of the specific activity requiring [a] permit and those portions of the entire project over which the district engineer has sufficient control and responsibility to warrant Federal review" in the EA or EIS. 33 C.F.R. Part 325 Appendix B S 7(b). The Corps' determination of the appropriate scope of the environmental review process is entitled to deference. See Marsh, 490 U.S. at 375-76; Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 359 (1989).
 
 
 36
 The Corps' NEPA implementing regulation provides in pertinent part:
 
 
 37
 b. Scope of analysis. (1) In some situations, a permit applicant may propose to conduct a specific activity requiring a Department of the Army (DA) permit (e.g., construction of a pier in a navigable water of the United States) which is merely one component of a larger project (e.g., construction of an oil refinery on an upland area). The district engineer should establish the scope of the NEPA document (e.g., the EA or EIS) to address the impacts of the specific activity requiring a DA permit and those portions of the entire project over which the district engineer has sufficient control and responsibility to warrant Federal review.
 
 
 38
 (2) The district engineer is considered to have control and responsibility for portions of the project beyond the limits of the Corps jurisdiction where the Federal involvement is sufficient to turn an essentially private action into a Federal action. These are cases where the environmental consequences of the larger project are essentially products of the Corps permit action.
 
 
 39
 Typical factors to be considered in determining whether sufficient "control and responsibility " exists include:
 
 
 40
 (i) Whether or not the regulated activity comprises `merely a link' in a corridor type project (e.g., a transportation or utility transmission project).
 
 
 41
 (ii) Whether there are aspects of the upland facility in the immediate vicinity of the regulated activity which affect the location and configuration of the regulated activity.
 
 
 42
 (iii) The extent to which the entire project will be within Corps jurisdiction.
 
 
 43
 (iv) The extent of cumulative Federal control and responsibility.
 
 
 44
 33 C.F.R. Part 325, Appendix B S 7(b).
 
 
 45
 The Corps here determined that the EA `need not include substantial consideration of development in the uplands because development could occur in those areas regardless of whether this permit application is granted.' The Corps, therefore, only considered the environmental impacts resulting from MTP-PV's application to fill 16.1 aces of wetlands in constructing Phase I of the development.
 
 
 46
 WAN contends, and the district court found, that the Corps improperly limited the scope of its NEPA analysis and that it was required under NEPA and its ownregulations to evaluate the environmental impacts attributable to the whole development of Phase I of the project. WAN's argument centers on the assertion that the upland development planned in Phase I and the permit activities, i.e. the filling of the wetlands, are functionally interdependent. Without the permit, WAN avers, the Phase I development will not proceed and without the upland development the filling activities would not be justified. Additionally, WAN posits that the record demonstrates that the location and configuration of the wetlands to be filled greatly affected the design of the mixed-use development in Phase I and that, therefore, the Corps was required to consider the whole Phase I as a "federal action" for purposes of NEPA.
 
 
 47
 We have upheld an agency's decision to limit the scope of its NEPA review to the activities specifically authorized by the federal action where the private and federal portions of the project could exist independently of each other. In Sylvester, we reviewed the Corps' grant of a permit to fill eleven acres of wetlands in order to construct part of a golf course which itself was part of a larger resort complex. 884 F.2d at 396. The Corps limited its NEPA review to the impacts of the construction of the golf course, reasoning that it had no jurisdiction over the upland development. Id. at 396-397. We upheld the agency's decision, finding that although the golf course and the entire resort complex "would benefit from the other's presence" they were not sufficiently interrelated to constitute a single "federal action" for NEPA purposes. Id. at 400-01; see also California Trout v. Schaefer, 58 F.3d 469 (9th Cir. 1995) (upholding agency's decision to limit the scope of its NEPA review to impacts associated with the fill of wetlands rather than considering the impact on downstream fisheries from an entire canal project); Enos v. Marsh, 769 F.2d 1363, 1371-72 (9th Cir. 1985) (upholding agency's decision to exclude from its NEPA analysis the impact of non-federal shore facilities for a new deep draft harbor); Friends of Earth, Inc. v. Coleman, 518 F.2d 323, 328 (9th Cir. 1975) (finding that an agency was not required to prepare an EIS for state funded projects in a partially federally funded airport development). We have also looked to such factors as the degree of federal funding or supervision over a project. See Enos, 769 F.2d at 1371-72. Deciding whether federal and non-federal activity "are sufficiently interrelated to constitute a single `federal action' for NEPA purposes will generally require a careful analysis of all facts and circumstances surrounding the relationship." Friends of the Earth, Inc. v. Coleman, 518 F.2d 323 (9th Cir. 1995); accord Enos, 769 F.2d at 1371.
 
 
 48
 The district court found that the present case is distinguishable from Sylvester because neither the Phase I development nor the fill activities would occur independently of each other. The district court based its conclusion on evidence in the record which indicated that Phase I of the project could not proceed in the manner it was planned without the filling of the wetlands and that there were `crucial linkages' between MTP-PV's proposed local street grid system and the filling of the wetlands. The district court also found that, unlike the permitted activity in Sylvester, the specific activities authorized in the permit here, the filing of wetlands and the creation of the 51.1 acre freshwater wetland system, did not have independent utility.
 
 
 49
 The district court's determination that the project would not be able to proceed as planned without the permit and that the filling of the wetlands would not occur without the project is correct. The conclusion that the district court drew from these findings, however, is in error. The linkage that the district court found between the permitted activity and the specific project planned is the type of "interdependence" that is found in any situation where a developer seeks to fill a wetland as part of a large development project. If this type of connection alone were sufficient to require a finding that an entire project falls within the purview of theCorps' jurisdiction, the Corps would have jurisdiction over all such projects including those which the Corps' regulations cite as examples of situations in which the Corps would not have jurisdiction over the whole project. See 33 C.F.R. Part 325, Appendix B S 7(b)(3).
 
 
 50
 The district court determined that this case was controlled by Thomas v. Peterson, 753 F.2d 754, 758 (9th Cir. 1985), and that the Corps was required to consider the impact of both the Phase I upland development and the specific filling activity authorized by the permit in its NEPA analysis. The district court's reliance on Thomas to answer the question of whether the Corps has sufficient control and authority over the upland development to warrant federal review is misplaced. As is discussed below, Thomas involved a challenge to the Forest Service's determination that it was not required to consider the environmental impacts of two related federal actions in a single permit. In that case, the Forest Service did not dispute the fact that it would need to assess the environmental impacts of both actions at some point and that it had jurisdiction over both actions. Here, by contrast, the Corps does not have independent jurisdiction over the parts of the Phase I development that do not require the filling of wetlands. See also, California Trout, 58 F.3d at 474 (noting that Thomas is inapposite where the federal agency performing the environmental review does not have control over the whole project).
 
 
 51
 The Corps determination that it did not have jurisdiction over the upland development is supported by the record. Phase I encompasses development of approximately 600 acres, only 16 of which are subject to direct control by the corps through the permitting process. It appears that the project certainly could proceed without the permit and, as the Corps notes, is currently proceeding without the permit. Additionally, the project is not financed by federal money and state and local, not federal, regulations control the overall design. See California Trout, 58 F.3d at 473; Enos , 769 F.2d at 137172 (finding no federal action for purposes of NEPA where non-federal portion of a project received no federal funding and was not subject to federal supervision); Alaska v. Andrus, 591 F.2d 537, 541 (9th Cir. 1979) ("[w]here federal funding is not present, [we have] generally been unwilling to impose the NEPA requirement" of filing an EIS). The project has also been subjected to extensive state environmental review. See Sylvester II, 884 F.2d at 401 ("We, finally, draw comfort from the fact that ordinary notions of efficiency suggest a federal environmental review should not duplicate competently performed state environmental analyses").
 
 
 52
 The fill of the eight acres of wetlands for the purpose of creating the freshwater marsh could well be undertaken without the overall project, as well. The freshwater marsh sub-project has value in and of itself. Moreover, although there may be no reason to fill the remaining eight acres of wetlands if the rest of Phase I is not to be built, the regulations make clear that federal jurisdiction over this small segment of the development is not "control and responsibility" over the rest of the project sufficient to federalize the entire project. See 33 C.F.R. pt. 325 app. B S 7(b)(2) (providing that parts of a project beyond Corps jurisdiction must be considered "where the environmental consequences of the larger project are essentially products of the Corps permit action"); id. S 7(b)(2)(ii) (identifying one factor in determining "control and responsibility" is the "extent to which the entire project will be within Corps jurisdiction); id.S 7(b)(3) (providing as an example that "if an applicant seeks a . . . permit to fill waters or wetlands on which other construction or work is proposed, the control and responsibility of the Corps, as well as its overall Federal involvement would extend to the portions of the project to be located on the permitted fill" but not to other portions unless "the regulated activities, and those activities involving regulation, funding, etc. by other Federal agencies, comprise a substantial portion of theoverall project"). Given the deference that the agency's determination of its own jurisdiction is due, the Corps' decision to limit its review to the specific activity requiring the permit is not arbitrary or capricious.
 
 
 53
 b. Segmentation of Project
 
 
 54
 The Council on Environmental Quality's (CEQ) regulations implementing NEPA require that an agency consider "connected actions" and "cumulative actions " within a single EA or EIS. 40 C.F.R. S 1508.25. Although federal agencies are assigned the primary task of defining the scope of NEPA review and their determination is given "considerable discretion," connected or cumulative actions must be considered together to prevent an agency from "dividing a project into multiple `actions,' each of which individually has an insignificant environmental impact, but which collectively have a substantial impact." Thomas, 753 F.2d at 758.
 
 
 55
 The CEQ regulation provides that actions are "connected" if they:
 
 
 56
 (i) Automatically trigger other actions which may require environmental impact statements. (ii) Cannot or will not proceed unless other actions are taken previously or simultaneously. (iii) Are interdependent parts of a large action and depend on the larger action for their justification.
 
 
 57
 40 C.F.R. S 1508.25(a)(1). Cumulative actions are those "which when viewed with other proposed actions have cumulatively significant impacts." 40 C.F.R. S 1508.25(a)(2).
 
 
 58
 We use an "independent utility" test to determine whether an agency is required to consider multiple actions in a single NEPA review pursuant to the CEQ regulations. In Thomas, we addressed the issue of whether NEPA required the Forest Service to consider in a single review process the environmental impacts of the building of a road in a forest to facilitate logging and the timber sales that would result from that logging. We found that the logging operations and the construction of the road were "connected actions " because "the timber sales [could not] proceed without the road, and the road would not be built but for the contemplated timber sales." 753 F.2d at 759. See also, Save the Yaak Comm. v. Block, 840 F.2d 714, 720 (9th Cir. 1988).
 
 
 59
 Applying this same analysis, we have rejected claims "that actions were connected when each of two projects would have taken place with or without the other and thus had`independent utility.' " Morongo Band of Mission Indians v. FAA, 161 F.3d 569, 580 (9th Cir. 1998); see also Northwest Resource Information Center, Inc. v. National Marine Fisheries Service, 56 F.3d 1060 (9th Cir. 1995); Sylvester, 884 F.2d at 400. In Morongo Band, we found that the FAA did not improperly segment NEPA review of an airport's arrival enhancement project (AEP) from review of a larger airport expansion project, for which the FAA was preparing an EIS, because each project had independent utility. 161 F.3d at 580. We recognized that the expansion project would exacerbate the problems being addressed by the AEP, but found that the AEP was an independent action because it was designed primarily to deal with existing problems and therefore was not connected to any future expansion project. Id.
 
 
 60
 In this case, the Corps asserts that the three phases of the project are not connected actions because each have independent utility and that it therefore was not required to consider the environmental impacts attributable to the three different phases in a single NEPA analysis. The record supports the Corps' conclusion. Phase I of the development includes the development of approximately 600 acres that comprise 5 million square feet of office space, 13,000 dwelling units and hotel and retail space. The utility of this part of the project does not depend upon the completion of the later phases of the project. It would not be unwise or irrational to undertake the building of Phase I even if it was determined that the later phases could not be constructed. Trout Unlimited v.Morton, 509 F.2d 1276, 1285 (9th Cir. 1974) (finding that an EIS must cover a whole project when "[t]he dependency is such that it would be irrational, or at least unwise, to undertake the first phase if subsequent phases were not also undertaken").
 
 
 61
 Relying on Blue Mountains, WAN avers that, under the applicable regulations, the Corps should have considered the three phases of the project together as "cumulative actions." Blue Mountains involved a challenge to the Forest Service's determination that a single timber salvage sale would not have a significant environmental impact. 161 F.3d 1208 (9th Cir. 1998). We found that the CEQ regulations required the Forest Service to consider five related timber sales in a single NEPA analysis. Id. at 1214-16. Acknowledging that "NEPA does not require the government to do the impractical" and that the agency's determination of the scope of an EIS is entitled to deference, we nevertheless overturned the Forest Service's decision to analyze the sales separately. Id. at 1215 (internal quotation marks omitted). We found that the five sales were cumulative actions because they were part of a single project, were announced simultaneously to a coalition of logging companies, and were reasonably foreseeable. Id.
 
 
 62
 The instant case is distinguishable from Blue Mountains. Finding that the Corps was required in 1991-92 to have analyzed the environmental impacts of the three phases in a single EA or EIS would require the government to do the impractical. When MTP-PV applied for a permit for Phase I, many of the details and planning decisions regarding Phases II and III had not yet been completed. In fact, Phases II and III have still not received the required authorizations to begin development from various state and federal agencies and the local government. Additionally, unlike the situation in Blue Mountains, the Corps did include in the EA an evaluation of the environmental impacts of the whole project. Neither the CEQ regulations nor our precedent support the conclusion that the Corps was required to consider the three phases together as cumulative actions.
 
 
 63
 3. Corps' Finding of No Significant Impact ("FONSI")
 
 
 64
 Under NEPA, if an agency determines in an EA that the federal action will not significantly affect the environment, it may issue a FONSI. Northwest Resource Info. Ctr., 56 F.3d at 1064. "If the proposed action will have a significant impact, the agency must prepare an EIS which addresses in detail the purpose and need for the action, the environmental impacts of the action, and alternatives to the action." Id.; 40 C.F.R. SS 1501.4 and 1502.10. CEQ's regulations require an agency to consider the context and intensity of the environmental impacts in making the determination as to the significance of the impacts. 40 C.F.R. S 1508.27. The agency must consider, inter alia, "[t]he degree to which the effects . . . are likely to be highly controversial" and "[t]he degree to which the possible effects . . . involve unique or unknown risks." 40 C.F.R. S 1508.27(b)(4), (b)(5).
 
 
 65
 a. Untested Nature of Freshwater System
 
 
 66
 The district court found that the Corps' decision not to issue an EIS was arbitrary and capricious because there were substantial questions regarding whether the proposed freshwater wetland system would adequately mitigate the loss of the filled wetlands. "An agency must prepare an EIS if `substantial questions are raised as to whether a project . . . may cause significant degradation of some human environmental factor.' " Greenpeace Action, 14 F.3d at 1332 (citing LaFlamme v. FERC, 852 F.2d 389, 397 (9th Cir. 1988)). The district court found the record replete with comments questioning the feasibility of the wetland system and noting that the Corps' conclusion that the system would result in an environmental benefit was not based on scientific data. The district courtfurther found that the Corps largely ignored these comments and that the Corps' conclusion that the freshwater system would result in an environmental benefit was not supported by substantial evidence.
 
 
 67
 The district court's finding that there exist substantial questions regarding the feasibility of the freshwater system appears to be largely based on a mis-characterization of the evidence found in the administrative record. The record does contain many agency and public comments criticizing the freshwater system. A majority of these comments, however, do not question the feasibility of the freshwater system or indicate that the system would have negative impacts on the environment.
 
 
 68
 For example, to support its finding that both the FWS and the EPA recognized that MTP-PV's proposal to build the freshwater wetland system within the retention basin was not feasible, the district court cited comment letters submitted by the EPA and FWS. The letter from the EPA, however, does not address the feasibility of the freshwater wetland system. Rather, in its comments, the EPA requests that MTP-PV provide the following information:
 
 
 69
 A. Determination if the freshwater marsh will receive water from the proposed on-site water treatment facility and if so, the quantity of water.[MTPPV] should provide an evaluation of the quantity and quality of wildlife habitat the freshwater marsh would provide if it received this treated water and if treated water was not used in the marsh.
 
 
 70
 B. Determination of the contaminants which would enter the freshwater marsh if surface run-off, remediated groundwater and/or reclaimed wastewater were used. [MTP-PV] should explain how the contaminant and sediment loading in the freshwater marsh would be managed. The information provided should include the frequency and location of any sediment and vegetation removal that is expected to be required, how this will affect the quantity and quality of wildlife habitat, and where the sediment will be disposed.
 
 
 71
 Letter from Harry Seraydarian, Director, Water Management Division, EPA, to Colonel Charles S. Thomas, District Engineer, Corps (February 6, 1991). Similarly, in the referenced comment letter, FWS suggested that the plan for the freshwater system be revised to allow for urban runoff to be diverted around the system, but it did not express any opinion on the feasibility of the system.
 
 
 72
 The record in this case also belies the district court's finding that the Corps ignored the negative comments it received and that the Corps lacked a substantial basis for the scientific determination that the freshwater system is viable. The commentators who expressed concern about the feasibility of the freshwater system generally discussed the ability of the system to serve the various purposes for which it was designed, its ability to handle pollutants, and the quality and quantity of the water entering the system. The record reveals that the Corps considered each of these issues and relied on substantial evidence in making its determination that the freshwater system was feasible.
 
 
 73
 In reviewing the environmental impacts of the permit activity, the Corps considered numerous reports, studies, and comments which evaluated the feasibility of the freshwater wetland system. A review of the administrative record demonstrates that the Corps considered, inter alia, the biological needs of the native habitat and wildlife of the region, water quality issues related to the project, the drainage, watershed characteristics, water levels of the area, and possible flooding that may be associated with the freshwater system. The Corps' conclusion that the construction of the freshwater wetland system will result in a net environmental benefit was based on relevant and substantial data.
 
 
 74
 We have held that when the record reveals that an agency based a finding of no significant impact upon relevant and substantial data, the fact that the recordalso contains evidence supporting a different scientific opinion does not render the agency's decision arbitrary and capricious. Greenpeace Action, 14 F.3d at 1333; cf. Foundation for North Am. Wild Sheep v. United States Dep't of Agric., 681 F.2d 1172, 1178 (9th Cir. 1982) (finding that an agency's failure to address "certain crucial factors, consideration of which was essential to a truly informed decision whether or not to prepare an EIS," rendered its decision that no EIS was necessarily unreasonable). "When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive. " Marsh, 490 U.S. at 378; see also Friends of Endangered Species, Inc. v. Jantzen, 760 F.2d 976, 986 (9th Cir. 1985) ("NEPA does not require that we decide whether an EIR is based on the best scientific methodology available, nor does NEPA require us to resolve disagreements among various scientists as to methodology").
 
 
 75
 Because a review of the record reveals that the Corps took a hard look at the environmental consequences of allowing MTP-PV to construct the freshwater wetlands system and the Corps based its decision to issue a FONSI on an evaluation of the relevant factors, the Corps' decision was not arbitrary and capricious.
 
 
 76
 b. Mitigating Factors
 
 
 77
 An agency's decision to forego issuing an EIS may be justified by the presence of mitigating measures. Friends of Payette v. Horseshoe Bend Hydroelectric Co., 988 F.2d 989, 993 (9th Cir. 1993). "If significant measures are taken to `mitigate the project's effects, they need not completely compensate for adverse environmental impacts." Id . (internal quotations and citation omitted). In evaluating the sufficiency of mitigation measures, we focus on whether the mitigation measures constitute an adequate buffer against the negative impacts that result from the authorized activity to render such impacts so minor as to not warrant an EIS. Greenpeace Action, 14 F.3d at 1332.
 
 
 78
 In the EA, the Corps found that the filling of the wetlands would not significantly effect the environment and that any negative impacts that would result would be mitigated by the creation of the 51 acre freshwater system. At the time the permit was issued, however, the complete mitigation plan had yet to be set forth with specificity. In order to avoid substantial delays, the Corps decided to issue the permit before all the details of the mitigation plan had been finalized. In lieu of a detailed plan, the Corps placed special conditions in the permit requiring MTP-PV to develop the plans according to the guidelines set forth in the special conditions. MTP-PV was prevented from commencing any work on the project until the plans were submitted to and approved by the Corps.
 
 
 79
 WAN contends that the Corps decision to issue the FONSI was arbitrary and capricious because it was based on an incomplete mitigation plan. WAN asserts that it is irrational to allege that the Corps could have made a reasoned evaluation of the effectiveness of the mitigation measures because it was impossible to determine the precise nature of the mitigation measures in the absence of a specific, finalized mitigation plan. Thus, WAN concludes, the Corps' finding that freshwater system would sufficiently mitigate the whole project was arbitrary and capricious.
 
 
 80
 WAN's analysis is flawed. WAN exaggerates the deficiencies of the mitigation evidence found in the record. A careful review of the record demonstrates that mitigation measures were developed to a reasonable degree and had been reviewed by the Corps and other federal agencies at the time the permit issued. Moreover, the special conditions included in the permit and reviewed by the various agencies were extremely detailed. Thus, the Corps could determine the precise nature of many of the mitigation measures at the time that it made the permitting decision. See Robertson,490 U.S. at 352 ("[I]t would be inconsistent with NEPA's reliance on procedural mechanisms -as opposed to substantive, resultbased standards -to demand the presence of a fully developed plan that will mitigate environmental harm before an agency can act.") WAN also exaggerates the need for mitigation here. The record supports the Corps' finding in the EA that the scattered wetlands to be filled pursuant to the permit are of a highly degraded quality and that little wetland value would be lost as a result of the Phase I filling activity. Due to the value of the freshwater system, the Corps found that the development of Phase I would increase the wetland values of the area. The record supports these findings.
 
 
 81
 In order to issue a FONSI, the Corps only needed to find that the mitigation measures would render any environmental impact resulting from the permit activity insignificant. The Corps did not act arbitrarily and capriciously in determining that an EIS was not required for MTP-PV's application to fill 16 acres of degraded wetland given the mitigating value of the freshwater system.[8]
 
 
 82
 c. Public Controversy
 
 
 83
 WAN asserts that the controversy surrounding the decision to build the freshwater wetland system required the Corps to prepare an EIS. "The existence of a public controversy over the effect of an agency action is one factor in determining whether the agency should prepare [an EIS]. " Greenpeace Action, 14 F.3d at 1333, 40 C.F.R. S 1508.27(b)(4). A federal action is controversial if "a substantial dispute exists as to [its] size, nature or effect." LaFlamme, 852 F.2d at 400-01 (internal quotation marks omitted). The existence of opposition to a use, however, does not render an action controversial. Id. at 401.
 
 
 84
 A majority of the objections raised to the development of the freshwater wetland system were premised on an opinion that it would be more appropriate to use the area as a saltwater marsh or that the geographic location of the marsh should be altered. These types of objections can not render a Corps' permitting decision controversial for NEPA purposes because they do not pertain to the "size, nature, or effect" of the development of the freshwater system. As was noted above, however, a dispute as to the effect that the freshwater system would have on the environment did exist. During the two year review process, the Corps was able to address these potential effects to the satisfaction of the other federal resource agencies, for all of the agencies eventually withdrew their objections to the issuance of the permit. See Northwest Environmental Defense Center, 117 F.3d at 1536. The Corps did not commit a clear error in judgment when it determined that this action was not controversial for NEPA purposes.
 
 CONCLUSION
 
 85
 MTP-PV does not have a legally protectable interest relating to WAN's NEPA claims and therefore the district court did not err in denying MTP-PV's motion to intervene as of right in regard to these claims. The district court erred, however, in finding that, in issuing the permit without preparing an EIS considering the environmental consequences of building the entire Playa Vista project, the Corps violated NEPA. The Corps' determination of the scope of the NEPA review and its issuance of a FONSI was not arbitrary and capricious. Accordingly, we reverse the district court's grant of summary judgment and remand to vacate the injunction.
 
 
 86
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
 
 
 
 Notes:
 
 
 [1]
 The Honorable John W. Sedwick, United States District Judge for the District of Alaska, sitting by designation.
 
 
 [2]
 The Defendant-Intervenor-Appellant Playa Capital Company is the successor-in-interest to Maguire Thomas Partners-Playa Vista. For clarity and consistency, we refer to the developer as MTP-PV as did the district court.
 
 
 [3]
 In a separate order, the district court granted the Corps' motion for summary judgment on WAN's CWA claim. WAN did not appeal that decision.
 
 
 [4]
 Amicus Curiae Friends of Ballona Wetlands challenged the California Coastal Commission's decision to certify the County's land use plan allowing for the development of Playa Vista. This litigation was settled in 1990. In 1993, an environmental group challenged the legality of the City of Los Angeles' Final Environmental Impact Report ("EIR") for the first phase of this project. The superior court found that the EIR was sufficient as an information document in that it disclosed the significant environmental effects and contained adequate alternative site, mitigation and cumulative impacts analysis. The court also rejected the plaintiffs claim that the City had impermissibly "piecemealed" the environmental review process by limiting its review to the first phase of the project. In 1996, one of the plaintiffs here challenged the City's environmental review of project modifications to accommodate development of the entertainment and media district and the wetlands design. The state court of appeals affirmed the state trial court's approval of the City's review process.
 
 
 [5]
 For planning purposes, MTP-PV divided the Playa Vista project site into four parcels designated Areas A, B, C, and D.
 
 
 [6]
 Phase I of the project involves the development of approximately 5 million square feet of office space, 13,000 residential units, and hotel and retail space.
 
 
 [7]
 Rule 24(a) provides:
 Upon timely application anyone shall be permitted to intervene in an action . . . (2) when the applicant claims an interest relating to property or transaction which is the subject matter of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.
 
 
 [8]
 The memorandum from the Corps' former project manager to her replacement, expressing her concern that the mitigation plans were not further developed, does not undermine our conclusion that the mitigation measures in the record were reasonably developed, that the special conditions were detailed, and that the approval of the Corps' District Engineer based thereon was not arbitrary or capricious.